BURRIDGE v. STUDEBAKER CORPORATION.

BROKERS—REAL ESTATE BROKERS—COMMISSIONS.

In an action by a real estate broker for a commission on the sale of real estate, where it appears that plaintiff had a written contract to sell the property for a limited time at $20,000, but was unable to do so, and so wrote defendant, who canceled his contract and later sold the property for $17,500 without any knowledge as to who the buyer was acting for, plaintiff was not entitled to a commission, and verdict should have been directed for defendant.

Error to Wayne; Mandell (Henry A.), J. Submitted January 18, 1921. (Docket No. 28.) Decided March 30, 1921.

Assumpsit by Charles W. Burridge against the Studebaker Corporation for commissions on the sale of real estate. Judgment for plaintiff. Defendant brings error. Reversed.

*Walters & Hicks,* for appellant.

*Robert M. Brownson (Frederick S. Baker,* of counsel), for appellee.

MOORE, J.  The plaintiff sued defendant for commissions he claimed he had earned resulting from a sale of real estate by the defendant.  At the close of the testimony the defendant made a motion to direct a verdict against the plaintiff, which motion was overruled.  The case was submitted to the jury and a verdict in favor of the plaintiff in the amount of $1,028.12 was returned.  The defendant moved the court to enter judgment in its favor *non obstante veredicto,* which motion was denied.  Later a motion for a new trial was made and denied.  The case is brought here by writ of error.

The relations between the parties as affecting this litigation is largely shown by correspondence.  We shall quote as much therefrom as we deem necessary to an understanding of the case:

"DETROIT, MICH., April 10, '16.
"To CHARLES W. BURRIDGE:
"In consideration of valuable services performed and to be performed by you, I, the undersigned, hereby give to you for a term of 10 days, the exclusive sale of the following described property, to wit:
"The Studebaker plant in Pontiac, all buildings and land that go with same, price $25,000, and lowest price to be accepted $20,000. * * * And in case you find a buyer ready and willing to consummate a deal on the foregoing terms, or in case of sale by you of said above described property during the life of this contract, I agree to pay you five per cent. as a commission. * * *
"This agreement shall be in full force for the term above specified, also to continue until I give you five days' written notice of withdrawal. * * *
"THE STUDEBAKER CORPORATION,
"By A. G. RUMPF, Secretary."

"April 8th, 1916.

"Mr. A. G. Rumpf,
    "South Bend, Indiana.

"*Dear Sir:* I see Mr. Warner of the Oakland several days ago and he promised to take the matter up with Mr. Nash and let me hear from them soon. I also have a deal on with some other parties through a dealer in Detroit. * * *

"The price I have quoted Oakland and the Detroit dealer is $25,000. I am going to hold to this price if possible and close up one or the other.

                "Yours very truly,
                    "Charles W. Burridge."

"April 28, 1916.

"Mr. Chas. W. Burridge,
    "24 W. Huron Street,
        "Pontiac, Michigan.

* * * "We have another deal that is pending which looks rather promising, and I wish you would write me by next mail stating what the prospects are of closing one of the two deals referred to in your letter of the 8th.

                "Yours very truly,

                        "Secretary."

"May 9th, 1916.

"Mr. Chas. W. Burridge,
    "24 W. Huron Street,
        "Pontiac, Mich.

"*Dear Sir:* We wish to withdraw the agreement signed on the 10th in respect to the sale of the plant in Pontiac. We have another deal pending to which we want to give attention, and we shall consider the arrangement as set forth in the agreement referred to canceled on the 14th. Kindly acknowledge receipt.

"We of course are not withdrawing the matter from your hands, and wish you to continue to give it attention. Do not, however, want this agreement to stand under the circumstances.

"On the 4th you reported that you had an appointment with Mr. Nash on the following Friday. We would be interested in knowing what, if anything, was accomplished.

                "Very truly yours,

                        "Secretary."

"May 11th, 1916.

"A. G. RUMPF,
   "South Bend, Ind.

*"Dear Sir:* Yours of the 9th inst. received and contents noted. I was unable to accomplish anything with Mr. Nash, and the other parties would not consider it at even $20,000.

"Yours very truly,
   "CHARLES W. BURRIDGE."

The record does not show any further correspondence until the following:

"Western Union Night Letter.
   "PONTIAC, MICH., June 15, 1916.

"A. G. RUMPF,
   "Sec'y Studebaker,
   "South Bend, Indiana.

"Understand General Motors has bought your plant here. If so, according to laws of Michigan, am entitled to the commission. If necessary will sue for same.

"CHARLES W. BURRIDGE.
   "10:35 P. M."

Then follows quite a voluminous correspondence in which plaintiff claims a commission and the defendant denies he is entitled to it.

The plaintiff was a witness in his own behalf and testified to interviews with Mr. Warner, who he testified was the president and general manager of the Oakland branch of the General Motors Company; that one of them was on May 12th or 13th, the second one in the neighborhood of the 15th or 16th of May. "My third would be probably the 17th or 18th of May." He also testified in a general way that he had talks with Mr. Spencer in Detroit. He does not testify that at any time was any price named for the property other than that mentioned in the letter of April 10, 1916, or that any different arrangement was made with defendant than what is contained in the letters of April 10th and May 9th.

213—Mich.—22.

On the cross-examination he testified in part:

"*A.* I did not find anybody, up to June 26th, 1916, who told me that they would give $20,000 for that piece of property. I know William B. Anderson of Pontiac. I don't claim that I have had any other talk to get him to purchase this piece of property."

The sale was actually made in Detroit by a Mr. Spencer, a representative of defendant company, living in Detroit, whose version of what occurred is as follows:

"I never had any talk with Anderson prior to June 7th when he came into my office. And after a considerable time prior to that, these matters had been taken out of my hands, and I was not paying attention to the real estate transactions here for the company prior to that time. I didn't know that it had been listed with Mr. Anderson. I didn't even know who he was. I didn't ask any questions as to whom he was representing. He sent up his card in the usual manner, as I recall, and it had a note on that he wanted to see me about the Pontiac plant. He came up and made me an offer. We agreed on the price and closed the deal right there that day. When he came in, he just offered me a stated sum for the total amount to be paid on this property. We made the deal right away, within the matter of an hour. Mr. Erskine happened to be there that day. That is the reason that I did not take it up with Mr. Rumpf. I went right to Mr. Erskine, the president. * * *

"No, I did not know he was buying for somebody else. Anderson came in the office and offered me $15,-000 for the property. I told him that we would not accept that—that it was too low. He said: 'Well, I have the cash to pay you for the plant. I will pay you $10,000 today, and the remainder as quick as you produce—or have your abstract brought down to date, and deliver the deed.' I told him that that was too low, and he said: 'Well, I know that the property has been vacant for a long time, and you are not getting any income from it. It is an expense to you, you better take this offer while you have the opportunity.' Mr. Erskine, the president, was here from South Bend

that day, and I felt that I ought to submit the offer of $15,000 to him, even though we had been asking $20,000 up to that time. So I went in his office and I told him that I had an offer of $15,000 for the plant. He conferred with Mr. Haslett a minute, and he said: 'Well, go ahead, Spencer, if you can't get any more than that, we will take the $15,000.' Then I returned to my own office, to Anderson, and I told him that I would split the difference with him, that is the difference between $15,000 and $20,000 or take $17,500 cash. He said: 'No, I don't want to pay that much.' We talked for about a minute or so more, and finally he said: 'Well, will you stand for a commission on that $17,500?' And I said: 'Yes, if you mean five per cent. off that price,' and he said: 'That is what I mean.' * * *

"I first learned that the General Motors got this property when I heard of it through Mr. Burridge, that is, through the letter that he sent me that I referred to earlier."

Mr. Anderson testified:

"I did not tell Mr. Spencer that I was buying this property for somebody other than myself. I made the offer on behalf of myself. * * *

"I don't think that I did anything for the General Motors directly until after 1916. At the time of that transaction that was talked about here, I didn't know anything about that this would go to Mr. Durant, at the time I made the transaction. I did not know or think it would go to the General Motors."

We now quote from the brief of counsel for the plaintiff.

"The record shows that Anderson testified as follows:

"*The Court:* I want to ask a question. I don't know why they don't. On this last deal, the deal that we are talking about; did you go to Warner or did he send for you?

"*A.* That would be hard to tell for the simple reason that we had—we were just talking of the farm proposition—he was just buying a farm.

"*The Court:* And then he spoke to you about this property?

"*A.* He asked me if I had any property in sight, and if I thought I could sell the Cartercar property. I said yes, I thought I could. At the time they placed the Cartercar property in my hands, which I afterwards sold.

"*Mr. Walters:* Did anybody that you know that had any connection with the General Motors Company ask you to take up this deal for them?

"*A.* Not to take it up for them; no, sir.

"*Mr. Walters:* Who did they ask you to take it up for?

"*A.* Mr. Warner asked me what was the lowest price I could buy that property for.

"*Mr. Walters:* Is he the one that sent you on a mission to buy?

"*A.* Well, he wanted me to see how low I could buy it."

Counsel citing in support of their contention that under this testimony there was a case for the jury, *Brooks* v. *Leathers,* 112 Mich. 463, and *Lerner* v. *Harvey,* 189 Mich. 249. A reference to those cases will show that the agreements for commissions were oral and that there was a sharp dispute about what the agreement was. In the instant case there is nothing to indicate that defendant, until long after the sale, had any knowledge of any talk between Mr. Warner and Mr. Anderson, or that it had any knowledge that the property was purchased for the benefit of the General Motors Company. The record is barren of any testimony that the plaintiff had any time brought to the attention of the defendant the fact that he had a purchaser who was able and willing to pay $20,000 for the property.

The record is also barren of any authorization given to the plaintiff to sell the property for less than $20,000. It also fails to show that defendant had any knowledge that the sale to Mr. Anderson was for the benefit of the General Motors Company. The trial judge should have directed a verdict in favor of the de-

fendant. *McDonald* v. *Boeing*, 43 Mich. 394 (38 Am. Rep. 199); *Wood* v. *Smith*, 162 Mich. 334; *Gilmore* v. *Bolio*, 165 Mich. 633 (34 L. R. A. [N. S.] 1050).

Judgment is reversed, with costs to the defendant, and a new trial ordered.

STEERE, C. J., and WIEST, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.